F I L E D
United States Court of Appeals
Tenth Circuit

FEB 12 2002

PATRICK FISHER
Clerk

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

DENISE REKSTAD,

       Plaintiff - Appellant,

v.

FIRST BANK SYSTEM, INC., a
Delaware corporation; FBS
MORTGAGE CORPORATION, a
Nevada corporation, formerly doing
business as Colorado National
Mortgage Corporation; FIRST BANK
SYSTEM LONG-TERM DISABILITY
PLAN, (PLAN #509),

       Defendants - Appellees.

No. 01-1204
(D.C. No. 97-N-1315)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **MURPHY**, Circuit Judge.

Plaintiff-Appellant Denise Rekstad sued her employer Defendant-Appellees

First Bank System, Inc., FBS Mortgage Corporation and First Bank System Long-

Term Disability Plan (hereinafter "First Bank"), under the Americans with

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel.  This court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Disabilities Act (ADA), 42 U.S.C. §§ 12101-12134. Rekstad alleges that her former employer, First Bank, refused to reinstate her after she suffered injury. The federal district court entered an order granting summary judgment in favor of defendants, and Rekstad appealed. We exercise jurisdiction under 28 U.S.C. § 1291. We affirm because we find that Rekstad failed to demonstrate a genuine issue of material fact as to whether First Bank's proffered reason for not permitting Rekstad return to work was unworthy of belief.

**Background**

Beginning in October 1991, First Bank employed Rekstad as a loan originator, a job which required her to originate, process, and close first mortgage residential loans. The work of a loan originator is generally sedentary, requiring little movement and little supervision. Rekstad registered superior performances in her position, and received commendations from First Bank for her work.

Rekstad suffered a serious ankle fracture in November 1993 and applied for and received benefits under the Short-Term Disability Plan from November 1993 through January 20, 1994. On January 20, 1994, Rekstad began receiving over $15,000 per month in disability benefits under Phase I of the Long-Term Disability Plan. Though not completely healed, Rekstad continued working and earning income during this time and until April 1994, with no noted drop in her

performance. She stopped working when Theodore Oare, Rekstad's manager, informed her that she could not continue until she provided First Bank with a "Return to Work Statement" ("release") from an attending physician, in accordance with the written policy of the disability plan. IV Aplt. App. at 1201; III Aplt. App. 834, ¶ 7.

Also in April 1994, Rekstad applied for total long-term disability benefits under Phase II of the plan, contending that she was totally disabled. Northwestern National Life Insurance Company ("National Life") served as disability claims administrator for First Bank during this time and received Rekstad's April 1994 application for long-term disability benefits, which it approved on June 8, 1994.[1] National Life then reiterated that if Rekstad should be released to return to any form of work, she should notify National Life and provide written verification. II Aplt. App. at 381-82.

Instead of receiving a release, First Bank received a series of notices from the Mayo Clinic where Rekstad had been treated, extending Rekstad's period of total disability first until February 1994, then until April 1994, and finally until June 24, 1994. II Aplt. App. at 367, 368, 378-80. Surgery on July 24, 1994 further incapacitated her until August 8, 1994.

---

[1] ITT Hartford ("ITT") replaced National Life as the claims administrator for the disability plan in January 1995.

During the fall of 1994, two physicians separately indicated that Rekstad could return to work. The physician attending Rekstad's July surgery, Dr. Miguel E. Cabanela, sent a letter dated September 14, 1994 to National Life pronouncing Rekstad's fracture completely healed, recommending a program of physical therapy, and predicting that her pain symptoms would subside within two months. III Aplt. App. at 653. National Life received this letter on October 3, 1994. In a second letter dated October 14, 1994, Dr. Cabanela again described the fracture as completely healed, and stated that Rekstad required no further medical care aside from a continuing exercise regimen. III Aplt. App. at 784. Yet another letter, this time from Dr. Dale Kaiser, dated October 27, 1994, and received by National Life on November 7, 1994, indicated that Rekstad could work full time with certain restrictions. III Aplt. App. at 650-52.

However, Dr. Kaiser apparently changed his opinion two weeks later in a report dated November 8, 1994 and received by National Life on November 15, 1994, which indicated that Rekstad was in fact totally disabled from all occupations. Another report from Dr. Kaiser dated December 8, 1994 said that Rekstad would be "significantly disabled" for three to four weeks. II Aplt. App. at 397. And in a letter dated January 27, 1995, Dr. Kaiser again indicated that Rekstad was totally disabled, but could return to work in six to eight weeks. II Aplt. App. 398-99.

Finally, on April 12, 1995, Dr. Kaiser sent a letter to the new claim administrator, ITT Hartford, stating that Rekstad's injury would not prevent her return to full employment. II Aplt. App. at 400. ITT conveyed this information to First Bank on June 1, 1995. Before First Bank reacted to Dr. Kaiser's release to work, Rekstad was gravely injured in an automobile accident on June 9, 1995. A representative of First Bank contacted Rekstad on June 14, 1995 and offered her a position as a loan administrator, a position Rekstad was forced to decline because her recent injuries left her once again totally disabled.

## I.  Legal Standard

We review the district court's grant of summary judgment *de novo*, applying the same legal standard used by the district court. McKenzie v. Dovala, 242 F.3d 967, 969 (10th Cir. 2001) (quotation omitted). Summary judgment is appropriate only if the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When applying this standard, we review the evidence and draw reasonable inferences therefrom in the light most favorable to the

nonmoving party.  McKenzie, 242 F.3d at 969 (citation omitted).  The nonmovant is given wide berth to prove that a factual controversy exists.  Id. (citation omitted).

## II.  ADA Claim

Rekstad claims that First Bank violated the provisions of the ADA by intentionally discriminating against her because of her disability.  She claims that First Bank thwarted her attempts to return to work with reasonable accommodation after her injury.  First Bank denies any discriminatory intent and instead argues that it did not rehire Rekstad because she failed to produce a physician's written opinion that she was medically fit to resume employment, as required by the disability plan covering Rekstad.

The ADA provides that no covered employer "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to...[the] discharge of employees... and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Id. § 12111(8).  To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show (1) that [s]he is disabled within the meaning of the ADA; (2) that [s]he is qualified–with or

without reasonable accommodation; and (3) that [s]he was discriminated against because of [her] disability. MacDonald v. Delta Air Lines, Inc., 94 F.3d 1437, 1443 (10th Cir. 1996).

We evaluate discrimination claims predicated upon the ADA using the burden-shifting analysis first used to examine Title VII employment discrimination claims in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), and later developed in Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-25 (1981) and St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-11 (1993).

Under this burden shifting framework, plaintiffs who make a facial showing that they are "qualified, disabled persons" under the ADA, create a presumption that the defendant engaged in unlawful discrimination. Hicks, 509 U.S. at 506. The district court concluded that Rekstad made such a showing, a determination that First Bank claims was error. Since we decide below that summary judgment was proper because First Bank offered a legitimate reason for not rehiring Rekstad, and no evidence indicates this reason was pretextual, we do not address the issue of whether Rekstad was indeed "qualified and disabled" under the ADA.

Assuming then that Rekstad was qualified and disabled, the burden of production shifted to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the challenged employment decision. Morgan v.

Hilti, Inc., 108 F.3d 1319, 1321 (10th Cir. 1997) (citation omitted). First Bank claimed that it refused to allow Rekstad to return to work because she failed to provide a medical release, as required by the disability plan. The goal of the release requirement–to ensure that returning to work does not hamper recovery–is rational and legitimate. Rekstad had notice of this standard requirement, from both the written policy and directly from National Life.

In order to survive summary judgment and proceed to trial, Rekstad must point to evidence that the employer's proffered reason for the challenged employment was pretextual–i.e., unworthy of belief. Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-48 (2000) ("a *prima facie* case and sufficient evidence to reject the employer's explanation may permit a finding of liability"). Rekstad argues that the district court erred in finding insufficient evidence of pretext.

First Bank's asserts that "in order to prove pretext, [Rekstad] 'must present sufficient evidence to demonstrate both that the employer's articulated reason for the adverse employment action was false and that discrimination was the real reason.'" Aple. Br. at 20 (citing Wilking v. County of Ramsey, 153 F.3d 869, 874 (8th Cir. 1998)). On the contrary, we do not require that plaintiffs meet this "pretext-plus" standard at the summary judgement stage, but instead require a showing of pretext only–that the proffered reason is unworthy of belief. Randle,

69 F.3d at 451-53 & 452 n. 16 (citations omitted); <u>Reeves</u>, 530 U.S. at 147-48. To the extent that the district court found Rekstad's evidence of pretext insufficient to establish "that [First Bank] discriminated against Rekstad on the basis of her disability," I Aplt. App. at 201, that heightened standard has since been rejected and we review the evidence only for its adequacy to render First Bank's medical release requirement unworthy of belief for a reasonable jury. <u>Reeves</u>, 530 U.S. at 147-48. Even under this lower standard, however, Rekstad falls short of providing adequate evidence to withstand summary judgment.

A plaintiff may establish pretext by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action" which could lead a reasonable factfinder to label the asserted non-discriminatory reason unworthy of credence. <u>Morgan v. Hilti, Inc.</u>, 108 F.3d at 1321 (quotations omitted). A plaintiff typically makes a showing of pretext in one of three ways: (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff. <u>Kendrick v. Penske Transp. Servs., Inc.</u>, 220 F.3d 1220, 1230 (10th Cir. 2000) (quotation

- 9 -

omitted).

Rekstad concedes that requiring a medical release is not, on its face, a pretext for disability discrimination. However, she offers essentially three points to support her claim that, in practice, the medical release requirement as implemented in this case is unworthy of credence: (1) that First Bank waived the release requirement when it allowed Rekstad to work without a medical release, (2) that First Bank insisted on a *de facto* unqualified medical release, and (3) that various medical records and physicians' letters amounted to a medical release which First Bank ignored.

First, Rekstad claims that First Bank allowed her to work without a release after her injury and until April 1994 and that she was forced to stop working only when she communicated with her manager that complications would delay her full recovery. First Bank conceded at oral argument that allowing Rekstad to return to work after her injury without a medical release was contrary to the disability plan policy.

Rekstad does not present any evidence that other similarly situated employees were not required to provide a medical release, only that enforcement of the requirement, for a very brief period, was not adhered to for her. First Bank's Human Resources worker Terri Kunz testified to the Bank's normal practice. III Aplt. App. at 385 ("We did not return anyone to work unless we had

the release on disability.") A temporary lapse in enforcing the medical release requirement does not taint the legitimacy of later enforcement and is at most a scintilla of evidence that does not create a genuine issue of material fact that First Bank's reason for not rehiring Rekstad is pretextual. Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999)

Second, Rekstad argues that she provided adequate evidence that First Bank's actual motive for not rehiring her was their adherence to a "completely-healed" policy, requiring her to return to work full-time at "regular hours." The parties do not dispute that both the disability plan and the ADA require that the release to work program accommodate individualized restrictions and capabilities. The release described in the disability plan asks the employee to include the number of hours per day the individual can work and any restrictions the injured employee might require. IV Aplt. App. at 1201.

Rekstad points to First Bank Human Resources worker Terri Kunz's statement that if Rekstad were able to return part-time and no part-time jobs were available at First Bank, then Rekstad had to remain on a leave of absence until she could return full-time. III Aplt. App. at 778. Another note written by Kunz similarly indicated that First Bank did not have to offer her a part-time position if none was available. III Aplt. App. at 783. Neither statement relates to the

medical release requirement, and both statements indicate only that Kunz believed that, unless some part-time position was available, Rekstad would have to return as a full-time employee. We do not see how this sentiment casts disbelief on the medical release requirement.

Rekstad further claims that her manager, Theodore Oare, told her in April 1994 that First Bank must receive a statement that Rekstad was completely healed before she could return to work. III Aplt. App. at 834, ¶ 7. In Oare's deposition testimony, he stated repeatedly that he did not know exactly what kind of letter Rekstad needed or what the letter was required to state. Consistent with his apparent unfamiliarity with the release requirement, he stated that he "wouldn't disagree" that Rekstad was told that she must be completely healed before she returned to work. III Aplt. App. at 727. From Mr. Oare's testimony, Rekstad asks us to make two inferential leaps – first, that First Bank demanded a full medical release from her, and that therefore, First Bank fabricated the medical release requirement. The equivocal statement of a manager clearly unfamiliar with the disability plan and its requirements is insufficient to support those two inferences. Rekstad also offers her own affidavit as further evidence of First Bank's "completely healed" policy and, specifically, of Mr. Oare's statements to her. Nevertheless, we find that this single statement made at the outset of Rekstad's tenure on long-term disability, is not sufficient to create a triable issue

of fact.

Rekstad points to two notes made by claims administrators, one that says "I recommend immediate referral?? Release to sedentary work," and another that says Rekstad "is interested in returning to FBS, but sounds like they want a full release first." III Aplt. App. at 647, 661. We find the first note cryptic and probative of nothing. The second note is a recounting of a conversation with Rekstad, and is inadmissible hearsay. At the summary judgment stage, Rekstad need not produce evidence in a form that would be admissible at trial, but the content or the substance of the evidence must be admissible. Hardy v. S.F. Phosphates Limited Co., 185 F.3d 1076, 1082 n. 5 (10th Cir. 1999) (citations omitted); Fed. R. Civ. P. 56(e). As hearsay, this statement is not properly considered under summary judgment. Even if admissible, however, the note does not raise a genuine issue of material fact that the medical release requirement was pretextual.

Rekstad's third basis for attacking the believability of the medical release requirement is that she provided documents tantamount to a medical release to First Bank via the claims administrator, National Life. Rekstad argues that because First Bank's agent received the releases, then First Bank should be charged with constructive notice of them.

We disagree. Regardless of whether the letters sent from Drs. Cabanela

and Kaiser to National Life actually constituted legitimate medical releases, there is no evidence in the record that these letters ever reached First Bank or that Rekstad informed First Bank that she had provided them to National Life. The written policy covering Rekstad's disability clearly states that the medical releases must be provided to First Bank. They were not.

Rekstad argues that knowledge of the letters should be imputed to First Bank. The responsibilities a principal accepts for its agents are simply inapposite to an inquiry into whether First Bank's failure to receive the releases was the real reason for not rehiring Rekstad. "The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs." Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1318 (10th Cir. 1999) (citation omitted). Imputing knowledge to First Bank from National Life does not serve the critical inquiry into what First Bank actually knew of the medical releases. Hence, evidence of National Life's receipt of the doctors' letters, without more, would not permit a reasonable factfinder to reject First Bank's explanation for not rehiring Rekstad.

Furthermore, this is not a case where the employer merely hid behind an administrator in an effort to defeat liability. The letters from Rekstad's physicians to National Life were absolutely inconsistent and no reasonable trier of

- 14 -

fact could conclude that an employer's refusal to rely on them was pretextual. Though Rekstad claims that First Bank stymied her efforts to return to work from April 1994 through June 1995, the first potentially worthy medical release was not received by National Life until October 3, 1994. National Life received two similar letters within a five-week span from October 3, 1994 to November 7, 1994. However, on November 15, 1994, National Life received the first of several medical records stating that Rekstad was again totally disabled. Though we hold that knowledge of these letters cannot be imputed to First Bank in order to question the credibility of the medical release requirement, we note that even had First Bank known of the letters, the utter inconsistency of their content casts no doubt on First Bank's assertion that they did not rehire Rekstad because they did not have a conclusive medical opinion that she was sufficiently recovered to return to work.

Even considering Rekstad's circumstantial evidence in its totality, as we must, Simms, 165 F.3d at 1331, Rekstad has provided insufficient evidence for a reasonable jury to conclude that defendant's proffered reason for not rehiring Rekstad–lack of a medical release–is unworthy of belief.

We hold that Ms. Rekstad failed to present sufficient evidence upon which a rational factfinder could base a finding that First Bank's reason for not rehiring her was pretextual. We AFFIRM the district court's grant of summary judgment

in favor of First Bank.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge