**Karin Pagel MEINERS, Ph.D., Plaintiff,**

v.

**UNIVERSITY OF KANSAS, et al., Defendants.**

No. CIV.A. 01–2354–KHV.

United States District Court, D. Kansas.

Sept. 16, 2002.

Alan V. Johnson, Stephen D. Lanterman, Sloan, Listrom, Eisenbarth, Sloan & Glassman, Topeka, KS, for plaintiff.

Rose A. Marino, Barbara L. McCloud, Office of General Counsel, Lawrence, KS, for defendants.

### MEMORANDUM AND ORDER

VRATIL, District Judge.

Karin Pagel Meiners, Ph.D. brings suit against her former employer, the University of Kansas, alleging that it retaliated against her on account of protected activity in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and denied her due process of law in violation of 42 U.S.C. § 1983. The matter is before the Court on defendants' *Motion For Summary Judgment Against Plaintiff Pagel Meiners* (Doc. # 41) filed May 6, 2002 and *Plaintiff's Motion For Leave To File A Supplemental Memorandum In Opposition To Defendant's [sic] Motion For Summary Judgment* (Doc. # 50) filed July 19, 2002. For reasons stated below, the Court sustains both motions.

### *Factual Background*

The following facts are either undisputed or, where disputed, construed in the light most favorable to plaintiff.[1]

---

**1.** After defendants filed their reply, plaintiff moved to file a supplemental memorandum, alleging that defendants had presented new evidence and arguments which required a response. Under D. Kan. Rule 7.1(b), parties are permitted to file a dispositive motion, a response and a reply. Surreplies and supplements are typically not allowed. *See Metzger v. City Of Leawood,* 144 F.Supp.2d 1225, 1266 (D.Kan.2001). On the other hand, Federal Rule of Civil Procedure 56(c) requires that the nonmoving party be given notice and a reasonable opportunity to respond to movant's summary judgment materials. Thus, when a reply advances new reasons or evidence in support of a motion for summary judgment, the nonmoving party should be granted an opportunity to respond. If the district court grants summary judgment for movant without relying on new materials and arguments in the reply brief, however, it may preclude a surreply. *See Beaird v. Seagate Tech., Inc.,* 145 F.3d 1159, 1164 (10th Cir.1998) (court

In August 1992, plaintiff signed a written notice of appointment and began working for the University of Kansas as a probationary tenure-track assistant professor for the academic year which ran from August 1992 to May 1993. In pertinent part, plaintiff's employment contract stated that "subject to all provisions of the laws of Kansas and of the regulations, policies, minutes and resolutions of the Board of Regents and of the University of Kansas," the University offered plaintiff an appointment as Assistant Professor of Germanic Languages and Literature for the academic year beginning August 17, 1992. Exhibit 1 in *Exhibits In Support Of Defendants' Motion For Summary Judgment* ("*Defendants' Exhibits*") (Doc. # 43) filed May 6, 2002. The contract acknowledged that "in accordance with the regulations of the Board of Regents and of the University," plaintiff's appointment could lead to review for permanent tenure. It stipulated that final tenure review and decision would occur no later than the sixth year of full time teaching and that tenure would accrue after seven years of full time teaching unless notice to the contrary was provided in accordance with University and Board of Regents regulations on advance notice of non-reappointment. *Id.*

## I. Policies Governing Tenure

Robert Hemenway, Chancellor of the University, has the final decision whether to grant promotion and tenure. David Shulenburger, University Provost, oversees all matters relating to academic affairs. He is responsible for granting leave to tenure-track faculty members and independently recommends to the Chancellor whether promotion and tenure should be granted. Since 1993, the Chancellor has always followed Provost recommendations on those issues.

The Kansas Board of Regents is the governing body of the University, which is subject to Board of Regents rules, regulations and policies, and which derives most of its authority from the Board of Regents. Since 1947, the Board of Regents has adopted written rules, regulations and policies which govern tenure.

### Faculty Handbook

In 1992, when plaintiff received her initial appointment, the rules, regulations and policies on tenure were contained in the University's *Handbook For Faculty And Other Unclassified Staff* (1990 ed.) ("*Handbook*"). The *Handbook* contained tenure regulations which the Board of Regents had approved in 1947, based on the *1940 Statement of the American Association of University Professors* ("*1940 AAUP Statement*"), and amended in 1980, 1981 and 1982.[2] The *Handbook* set forth the Board of Regents' tenure regulation, which generally provided that "[a]fter the expiration of a probationary period, teachers . . . should have permanent or continuous tenure, and their services should be terminated only for adequate cause," and specifically provided that "[b]eginning with appointment to the rank of full-time instructor . . . the probationary period should not exceed seven years, including within this period full-time service in all institutions of higher education." Exhibit 4 in *Defendants' Exhibits* (Doc. # 43) at

---

may either permit surreply or refrain from relying on new material in reply brief). In this case, to the extent that plaintiff's surreply addresses arguments in defendants' reply, the Court will consider the arguments presented therein.

In her surreply, plaintiff contends that she has properly opposed several of defendants' statements of fact by relying upon reasonable inferences from the record. Plaintiff, however, is still obligated to provide record citations when she controverts a fact. *See* D. Kan. Rule 56.1(b)(1).

**2.** *See Handbook For Faculty And Other Unclassified Staff* (Exhibit 4) in *Defendants' Exhibits* (Doc. # 43) at 40.

40–41. Additionally, the 1990 version of the *Handbook*, which was in effect when plaintiff received her initial appointment, stated that "[p]art-time service to the University in teaching, research, and administration does not count toward tenure." *Id.* at 42. The *Handbook* was revised in 1997, and it again stated that "[p]art-time service to the University ... does not count toward tenure." Exhibit 30 in *Defendants' Exhibits* (Doc. # 43) at 61.

The *Handbook* also contained Board of Regents rules, regulations and policies governing notice for the non-reappointment of faculty members. In relevant part, those policies provided that "[p]rior to the time that a faculty member attains continuous tenure, termination may be effected by administrative action, provided timely notice is given." Exhibit 4 in *Defendants' Exhibits* (Doc. # 43) at 43. In plaintiff's case, the University was required to send notice of non-reappointment at least twelve months before the expiration of her probationary period.[3]

### Termination Procedure

The Provost testified that consistent with AAUP guidelines, the University must decide at the end of a faculty member's sixth year of full time service whether to terminate the employment relationship or grant tenure. He explained that the "six-year period of time gives you the opportunity to look at performance and make judgments about the future so that you don't make a wrong decision when you move someone into a permanent faculty position." *Deposition Of David E. Shulenburger* (Exhibit 5) in *Plaintiff's Appendix* (Doc. # 47) at 50:6–12. A tenured faculty member may only be terminated after a hearing.

### Policies On Interruption Of Probationary Period For Tenure–Track Faculty

Effective April 24, 1997, the University adopted a written policy on interruption of the probationary period for tenure-track faculty members. It generally provided that time on family and medical leave, nonscholarly leave without pay, and part time appointments might be excluded from the seven-year probationary period.[4] The policy expressly stated that upon request,

---

**3.** The one-year notice period was based upon comments regarding the *1940 AAUP Statement*, which explained that "[n]otice should be given at least one year prior to the expiration of the probationary period if the teacher is not to be continued in service after the expiration of that period." The *AAUP's 1970 Interpretive Comments* explained that "[t]he effect of this subparagraph is that a decision on tenure, favorable or unfavorable, must be made at least twelve months prior to the completion of the probationary period." If the decision is unfavorable, "the appointment for the following year becomes a terminal one."

Originally, the Board of Regents tenure policy did not contemplate extensions of the probationary period past seven years of full-time service and the Board of Regents could not extend a probationary period beyond seven years. On September 18, 1997, the Board of Regents amended its policy to state that "[u]nder unexpected special and extenuating circumstances, prior to the sixth year of service, and at the request of the faculty member and the appropriate dean, the Chief Academic Office of the university may grant an extension of the tenure clock for a maximum of one year." *Shulenburger Memorandum* (Exhibit 13) in *Plaintiff's Appendix* (Doc. # 47).

**4.** Specifically, the policy provided as follows: Occasionally during the probationary period, personal circumstances may prevent a faculty member from carrying out a significant portion of the responsibilities of his or her tenure-earning position. In such cases, the faculty member may have difficulty maintaining the necessary progress toward meeting the required academic responsibilities for the award of tenure within the specified period. In some unusual situations, the personal circumstances may qualify the faculty member for certain types of leave or reduction in appointment that extend the tenure clock. Under such unusual circumstances, a faculty member in a tenure-earning position may request, and if determined eligible, may receive (1) family medical

faculty on full time leave under the Family and Medical Leave Act for three consecutive months would receive an extension of the tenure clock for one year. In addition, the policy expressly stated that part time service did not count toward tenure.[5]

## II. Plaintiff's FMLA Leave In Fall 1994

In August 1993, the State of Kansas had a policy which implemented the Family

> leave under the Family and Medical Leave Act of 1993 (FMLA), (2) nonscholarly leave without pay, or (3) part-time appointment. The effect of each of these options is to provide the faculty member a period of time that is not included in the probationary period to address the specific circumstances.

*Interruption Policy Memorandum* (Exhibit # 12) in *Plaintiff's Appendix* (Doc. # 47) at 2. Further, the policy stated:

> Board of Regents policy on Family Medical Leave permits institutions to adopt a policy allowing a faculty member holding a tenure-earning position who has taken family medical leave to request an additional year to work toward tenure. The University of Kansas Lawrence campus policy is as follows: Faculty members granted full-time family medical leave for three consecutive months who are untenured, and not on a terminal appointment, will be granted an extension of the tenure clock for one year. However, the approval of a request for Family Medical Leave by the Department of Human Resources will not automatically extend the tenure clock. A separate request must be submitted to the Office of the Provost.

*Id.*

5. Specifically, it stated as follows:

> Part-time service to the University in teaching, research, and administration does not count toward tenure.... Appointment reductions remove the faculty member from the tenure-earning position. A faculty member previously in a tenure-earning position who enters into a reduced appointment may automatically reenter the tenure-earning position if he or she returns to full-time status within one academic or calen-

and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615, for all state employees.[6]

In March of 1994, plaintiff requested and received part time FMLA leave to care for her three-month old child. Plaintiff's leave consisted of a 40 per cent reduced work schedule from August 22 to December 8, 1994, which plaintiff covered by using 173.5 hours of paid sick leave and 62.9 hours of unpaid leave, for a total of 5.97 work weeks.[7] The Provost testified

> dar year of the beginning of the reduced appointment. A faculty member who does not return to full-time status within one year will be issued a term appointment.

> . . . . .

> Time accrued toward the probationary period before the reduction in appointment will be counted toward the probationary period when the individual reenters a tenure-track position. The resulting total probationary period will not exceed seven years.

*Id.* at 3.

6. On September 22, 1993, the University issued a memorandum to faculty which summarized the application of the policy. The memorandum provided that if family medical leave was approved, employees were entitled to 12 workweeks of leave during a 12 month period, and that leave could also be granted on an irregular or reduced work schedule basis. In addition, it stated that upon return from leave, an employee was guaranteed that he or she would be returned to the same or equivalent position. *FMLA Memorandum* (Exhibit 9) in *Plaintiff's Appendix* (Doc. # 47) at 2–3.

7. According to Dr. William Keel, plaintiff's department chair, plaintiff's leave was structured so that she would not lose any salary. He testified that:

> We actually worked out a mechanism so that she could indeed utilize the provisions of the Family Medical Leave Act and not lose a penny of her salary by—by constructing the leave in a fashion that she would only be on a 40 percent reduction for the subsequent fall semester, now we're talking about fall of '94.

*Deposition of William Keel* (Exhibit 4) in *Plaintiff's Appendix* (Doc. # 47) at 91:13–21.

that a faculty member on paid sick leave continues to be on full time service.[8]

In July 1994, after the University approved plaintiff's request for FMLA leave but before the leave commenced, plaintiff received an annual notice of continuing appointment for the 1994–95 academic year. Then–Chancellor Gene Budig signed the notice, which stated that plaintiff's appointment was "1.00 FTE." [9] Chancellor Hemenway testified that according to University custom and practice, the notice of continuing appointment will note if a faculty member is not on full time appointment for a given semester or year.

On February 10, 1995, Dr. Keel wrote a letter to Shulenburger, who was then Vice Chancellor of Academic Affairs, stating that for FMLA leave plaintiff had been permitted to reduce her appointment by 60 per cent in the fall semester of 1994 but that she had resumed full time duties. The letter did not request an extension of the date for plaintiff's mandatory tenure review. On March 15, 1995, however, Shulenburger notified plaintiff that her period of part time service did not count toward the seven-year probationary period and that the date of plaintiff's mandatory tenure review had been adjusted to reflect that change of status. Shulenburger specifically advised plaintiff that her review would occur no later than the 1998–1999 academic year. *Shulenburger Letter* (Exhibit 3) in *Defendants' Exhibits* (Doc. # 43).

### III. Plaintiff's Reduced Appointment In Fall 1997

On March 3, 1997, plaintiff requested a 40 per cent reduction in her appointment for the fall semester of 1997 because of her husband's death. She conferred with Dr. Keel and at that time she understood that "taking this reduction will automatically postpone the mandatory review by one year." *Pagel Letter* (Exhibit 6) in *Defendants' Appendix* (Doc. # 43). On March 28, 1997, the Provost approved plaintiff's request and again advised her that University regulations did not count part time service toward the probationary period.[10]

Defendants attempt to controvert this fact, arguing that Dr. Keel's testimony relates to the spring semester of 1994, not the fall semester of 1994. Dr. Keel's deposition testimony is equivocal on this point and does not clearly indicate which semester is at issue. Furthermore, defendants do not argue that plaintiff was on leave for two semesters. The particular semester during which she was on leave is not a matter of particular importance.

8. Dr. Shulenberger's deposition testimony was as follows:
Q: [L]et's say a faculty member had to take a month of sick leave during a semester, paid sick leave. In your mind, would that be, mean that that employee was less than full-time service for that year, academic year?
A: They're simply on sick leave during that period, being paid for sick leave. I think they would continue to be on the payroll and continue to be full-time while they were being paid for their sick leave.

*Shulenburger Deposition* (Exhibit 5) in *Plaintiff's Appendix* (Doc. # 47) at 73:19–74:6.

9. "1.00 FTE" indicates full time employment unless the notice indicates otherwise.

10. His letter specifically stated
I approve your request and authorize your appointment for the Fall 1997 semester at the 60 percent level. Under our tenure regulations, part-time service does not count toward the probationary period. Therefore, we have adjusted the date of your mandatory review for tenure to reflect this change in status. The review must occur no later than the 1999–2000 academic year.
*Shulenburger Letter* (Exhibit 7) in *Defendants' Appendix* (Doc. # 43).
Plaintiff asserts that in March 1997 the Board of Regents had not authorized the University to extend a faculty member's probationary period. The cited reference does not support this assertion, and the Court will not consider it. *See* D. Kan. Rule 56.1(d).

## IV. Denial Of Plaintiff's Tenure And Request For Graduate Faculty Status

In the spring of 1996, plaintiff received a pre-tenure review. During the 1999–2000 academic year, the University considered plaintiff for tenure and promotion to associate professor. It decided to deny tenure and promotion, however, and in March of 2000 plaintiff received a notice of non-reappointment and a terminal contract for the 2000–2001 academic year. In September 2000, plaintiff made a self-nomination for promotion and tenure, asking the University to rescind its notice of non-reappointment.

As a result of her terminal contract, plaintiff was no longer eligible for membership on the graduate faculty. Plaintiff had one graduate student who was enrolled for the fall semester of 2000, however, and Dr. Keel requested that her graduate faculty status be extended through that semester. On October 26, 2000, the University approved this request.

On September 26, 2000, plaintiff filed an administrative complaint with the Kansas Human Rights Commission ("KHRC"). Plaintiff's charge generally complained of her feeling that since her employment in May 1992, she had been subjected to continuous discrimination.[11] Dr. Keel learned of plaintiff's charge in October 2000.[12]

On December 1, 2000, the Provost informed plaintiff that any further request to extend her graduate faculty status must originate with her department and receive the endorsement of the Dean of the College of Liberal Arts and Sciences. On January 2, 2001, plaintiff asked Dr. Keel to extend her graduate faculty status through the spring semester of 2001 so that she could continue work with her graduate student. Dr. Keel agreed to present plaintiff's request to the department's Promotion and Tenure Committee, which consisted of himself and Professors Leonie Marx, Frank Baron and Ernst Dick. The committee unanimously decided not to endorse plaintiff's request,[13] and on

**11.** Plaintiff's charge continued as follows:

In the Fall of 1993, I voiced this concern in the context of maternity leave and bereavement leave. I also voiced my concern of discrimination to David Shulenburger, Provost, beginning with the 2000 school year. As far as I know[,] nothing was done to investigate my concerns. On April 9, 2000, I received notification from the University that I was denied tenure. The notification letter was dated March 24, 2000, but notice was served on me April 9, 2000. This notification terminates my employment at the end of this school year.

*KHRC Administrative Complaint* (Exhibit 12) in *Defendant's Appendix* (Doc. # 43).

**12.** The KHRC dismissed plaintiff's complaint on January 31, 2001 on account of the pending litigation.

**13.** At his deposition, Baron could not recall whether plaintiff's graduate faculty status was discussed during a committee meeting. After his deposition, however, he submitted an affidavit that the topic had come up and that the committee had recommended against extending plaintiff's graduate faculty status. Plaintiff contends that this affidavit is an attempt to create a sham factual issue which contradicts Baron's sworn deposition testimony.

The Court will disregard declarations which are inconsistent with prior sworn testimony if the changes attempt to create a sham fact issue. *See Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir.1986). "[T]he utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting ... prior testimony." *Id.* The factors relevant to the existence of a sham fact issue include "whether the affiant was cross-examined during [his] earlier testimony, whether the affiant had access to the pertinent evidence at the time of [his] earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Erasmus v. Wal–Mart Stores, Inc.*, 24 Fed. Appx. 979, 982 (10th Cir.2002) (quotation omitted). Baron's initial

January 19, 2001, Dr. Keel advised her that as far as the department was concerned, the matter was closed.

On January 4, 2001, plaintiff requested medical leave for the spring semester of 2001. Her physician had recommended that she take medical leave for the entire semester, but she requested 55 per cent leave because she did not think that she had sufficient sick leave to take a greater amount.

On February 6, 2001, plaintiff filed an administrative complaint with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff alleged that (1) the University had denied her request for tenure and promotion on account of her sex

and past opposition to discriminatory practices, and that (2) since that time, the University had engaged in a pattern of discrimination and retaliation, as evidenced by (a) its failure to properly handle her appeal of the decision on tenure and promotion; (b) its mishandling of her application for tenure and promotion; (c) its alteration of material terms of her employment; (d) its decision to remove her from graduate teaching status; and (e) its refusal to accept her doctor's request for medical leave.[14]

In February or March 2001, plaintiff applied to the University Office of International Programs for a travel grant. According to Dr. Keel, plaintiff was not eligible for the grant because she no longer had graduate faculty status.[15]

deposition testimony indicates that he could not recall whether the topic of plaintiff's graduate faculty status had come up. His affidavit does not contradict his earlier testimony that he could not remember the issue, rather it states what he was later able to recall. For this reason, the Court will not consider the affidavit to create a sham issue of fact.

14. Specifically, plaintiff's complaint alleged:

In the 1999–2000 academic year I went up for promotion and tenure. At that time I was the only woman to go up for promotion and tenure in over a decade. I also knew that all of the women who had been up for promotion and tenure before me had significant difficulties with the process of promotion and tenure in my department. Although I met all of the published requirements for promotion and tenure as set out by the Department of Germanic Languages and Literatures, I was denied promotion and tenure by the University of Kansas. During the promotion and tenure process, I informed the University that it appeared I was being treated differently based upon my gender and past opposition to discriminatory practices. I believe that the denial of promotion and tenure was based upon sex discrimination and retaliation. Since that time the University has engaged in a continuous pattern of discriminatory and retaliatory conduct. Such conduct has included the failure to properly handle my administrative appeal of the 1999–2000

promotion and tenure (which has yet to begin). The mishandling of my 2000–2001 promotion and tenure application (which is continuing at the present). Changing the material terms of my contract for employment. The removal of my graduate teaching status and graduate students when other similarly situated professors remain on the graduate faculty. Refusing to accept my doctor's request for medical leave as specifically prescribed by the doctor.

*EEOC Charge* (Exhibit 20) in *Defendant's Appendix* (Doc. # 43). The University was required to file a position statement regarding plaintiff's charge by March 7, 2001. Based on University custom and practice, the Provost was probably consulted about the University's response. Plaintiff argues that a jury could find a causal connection between her EEOC charge of February 6, 2001 and the Provost's letter of May 8, 2001 denying her request for tenure by default based on the two month and one week time lapse between the EEOC charge and the required response date.

15. Defendants assert that even if plaintiff had graduate faculty status, she would not have received the grant because faculty members may only receive one travel grant in a fiscal year and plaintiff had received one in the fall of 2000. Plaintiff, however, contends that she could have received a grant from the International Travel Research Fund in the same fiscal year as her other grant. Defendants complain that plaintiff's surreply first identifies

In March of 2001, the University advised plaintiff that her notice of non-reappointment would not be rescinded.

On April 24, 2001, the EEOC issued a "Dismissal and Notice of Rights" letter which stated that it had found no violation of any non-discrimination statute but advised plaintiff of her right to sue.

On May 4, 2001, plaintiff wrote the Provost, alleging that the extensions of her probationary period in 1994 and 1997 involved administrative errors and that she was entitled to tenure.[16] Specifically, plaintiff asserted that the University had erroneously extended her probationary period for one year, rather than one semester, on account of each one-semester leave of absence. Plaintiff calculated that with a one-year extension, her probationary period expired May 2000. Since she had not received notice of non-reappointment 12 months prior to that date, plaintiff asserted that she was entitled to tenure by default. In support of her position, plaintiff enclosed a letter dated April 26, 2001, which she had received from Dr. Martin Snyder, Associate Secretary of the AAUP, and a 1973 newspaper article which indicated that 11 faculty members at the University had received tenure in the spring of 1973 as a result of administrative error.[17] In his letter to plaintiff, Dr. Snyder summarized his assessment of the situation by stating

> [b]y Association standards, you are completing the ninth year of full-time ser-

vice at the University of Kansas and are, therefore, entitled to all the protections of tenure .... If the administration asserts that the tenure clock stops during a leave of absence, it is reasonable to argue that the two semesters should be added together to constitute one year of leave. In that case, you would be in your eighth year of service and still entitled to the protections of tenure mentioned above. It does not seem to me reasonable that the [U]niversity should attempt to subtract two complete years from your full-time service and hold the position that you are now completing your seventh and final year of probation.

*Snyder Letter* (Exhibit 18) in *Plaintiff's Appendix* (Doc. # 47).

On May 18, 2001, the Provost sent plaintiff a letter which rejected her claim of tenure by default. Exhibit 22 in *Defendants' Appendix* (Doc. # 43). His letter indicated that for each leave the University had added a year, rather than a semester, because the University had an annual schedule for promotion and tenure review and "[i]n order for your review to be conducted within the designated cycle, the adjusted date for your mandatory review reflected a full year in response to your initial request [for leave]." *Id.* Regarding the newspaper article, the Provost referenced a report by his assistant, Jeanette Johnson, and advised that "there is no similarity between your circumstances and those that obtained in 1973." *Id.* at 4.[18]

---

the International Travel Research Fund as a potential source of grants. In any event, plaintiff has not alleged that she was entitled to a travel grant from either fund. Nor has she established that without graduate faculty status, she was eligible for a grant from the International Travel Research Fund.

**16.** Plaintiff's letter concluded that "[i]n order to correct the errors in my case and to be in congruence with Regent's Policies and AAUP guidelines, the only honorable thing would be to retroactively grant me tenure as of 1999–

2000. I hereby respectfully make this request." *Meiners Letter* (Exhibit 21) in *Defendants' Appendix* (Doc. # 43).

**17.** Plaintiff believed that these errors involved miscalculation of probationary periods.

**18.** Johnson noted that the tenure class of 1973 had been hired under a five-year probationary period but that during that period the University had adopted a seven-year probationary period. Also, several members of the class had been hired as "acting" assistant

Plaintiff received eight annual notices of appointment from July 1992 through July 1999. Seven of them (all except the one for July 1997) indicate an appointment for 1.00 FTE. At his deposition, Chancellor Hemenway testified that "when you have had seven annual appointments at full-time status, then you have ended your probationary period." Exhibit 3 in *Plaintiff's Appendix* (Doc. # 43) at 11:23–25. According to Dr. Martin Snyder, the Associate Secretary of the AAUP, and Dr. Elmer Hoyer, former President of the Faculty Senate at Wichita State University and past president of the AAUP Kansas Conference, full time service should be calculated on a semester-by-semester rather than a year-by-year basis.

The University terminated plaintiff's employment on May 19, 2001, at the end of her terminal contract. Plaintiff filed suit on July 20, 2001. Count I alleges that because she complained of discrimination and filed administrative complaints, defendants retaliated by removing her from the graduate faculty and denying her requests for reinstatement to the graduate faculty, in violation of Title VII, 42 U.S.C. § 2000e *et seq.* Count II alleges that because she complained of discrimination and filed administrative complaints, defendants retaliated by denying her request for tenure by default, thus terminating her relationship with the University, in violation of Title VII, 42 U.S.C. § 2000e *et seq.* Count III alleges that Hemenway and Shulenburger deprived her of due process under the Fourteenth Amendment and 42 U.S.C. § 1983.[19]

Defendants seek summary judgment on all claims. Defendants argue that they are entitled to summary judgment on plaintiff's retaliation claims (Counts I and II) because (1) removing her from the graduate faculty, denying her requests for reinstatement to the graduate faculty and denying her demand for tenure by default were not adverse employment actions which would support a claim of retaliation; (2) none of these actions, or plaintiff's termination, bear a causal connection to her protected activity; and (3) even if plaintiff can establish a prima facie case based on these claims, defendants had non-retaliatory reasons for their actions. Defendants also argue that they are entitled to summary judgment because any claim relating to the tenure clock extension in March 1997 is time-barred and plaintiff did not exhaust administrative remedies on any claim that she is entitled to tenure by default. Defendants further assert that they are entitled to summary judgment on plaintiff's Section 1983 claim because (1) the individual defendants are entitled to qualified immunity, (2) plaintiff did not have a property interest in her employment, and (3) plaintiff was not denied due process.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together

---

professors and it was not clear whether time served in that capacity counted toward the probationary period. Johnson reported that "University Counsel [had] determined that persons who had come to the University as acting assistant professors on full-time appointments, had served five years, and had not been given written notice of non-reappointment before the end of the fourth year of service had gained tenure by default." About a dozen faculty members fell into this category, and the University notified them that they had gained tenure. *Johnson Report* (Exhibit 20) in *Plaintiff's Appendix* (Doc. # 47) at 4.

**19.** The complaint, pretrial order and summary judgment materials do not specifically identify the protected activity which allegedly motivated defendants to retaliate against plaintiff, or the dates on which it occurred.

with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City Of Watonga, Okla.*, 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on her pleadings but must set forth specific facts. *Applied Genetics*, 912 F.2d at 1241.

The Court must view the record in a light most favorable to the party opposing summary judgment. *See Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. *See Anderson*, 477 U.S. at 250–51, 106 S.Ct.

2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

### *Analysis*

### I. Retaliation In Violation Of 42 U.S.C. § 2000e

Counts I and II allege that because plaintiff filed administrative complaints of discrimination, defendants retaliated in violation of Title VII by removing her from the graduate faculty and denying her requests to be reinstated to the graduate faculty (Count I) and denying her requests for tenure by default and terminating her relationship with the University (Count II). Defendants also argue that they are entitled to summary judgment on Count II because any claim that defendants retaliated by denying plaintiff tenure by default is time-barred or plaintiff did not exhaust administrative remedies on that claim.[20] Defendants also seek summary judgment on both retaliation claims because plaintiff cannot establish a prima facie case or show that their actions were pretexts for discrimination.

#### A. Procedural Challenges

Defendants argue that plaintiff cannot pursue a claim that they retaliated by denying her tenure by default because she did not timely file an administrative charge

---

**20.** Defendants do not make statute of limitations or exhaustion arguments as to plaintiff's retaliation claim based on denial of graduate faculty status.

or exhaust administrative remedies on that claim.

### 1. Statute Of Limitations

■ In Title VII actions, claims of discrimination under 42 U.S.C. § 2000e–5(e) must be filed with the EEOC or state agency within 300 days after an alleged act of discrimination. *See Martinez v. Wyo., Dep't Of Family Servs.*, 218 F.3d 1133, 1137 (10th Cir.2000) (citing *Martin v. Nannie & The Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993)). If plaintiff did not raise before the administrative agency every issue she now brings, any additional claim must be "reasonably related" to the claims that she did bring before the administrative agency. *See Brown v. Hartshorne Pub. Sch. Dist. No. 1*, 864 F.2d 680, 682 (10th Cir.1988).

■ As noted above, plaintiff claims that because she engaged in protected activity, defendants denied her request for tenure by default. Defendants contend that the statute of limitations on this claim started to run on March 28, 1997, when the Provost sent plaintiff a letter which approved her request for a reduced appointment for the fall of 1997 and stated that her tenure review would occur in the 1999–2000 academic year instead of the 1998–99 academic year. In the alternative, defendants argue that the statute began to run in May 2000, at the conclusion of the seventh year of full time teaching, calculated on a semester-by-semester basis, when plaintiff alleges that she should have received tenure by default. Plaintiff contends that neither date is correct and that

defendants' retaliation and adverse employment action occurred on May 18, 2001—when the University denied her request for tenure by default.

■ Count II alleges that because plaintiff engaged in protected activity on September 26, 2000 and February 6, 2001, defendants retaliated on May 18, 2001 by denying her request for tenure by default. The statute of limitations on that retaliation claim could not possibly run from March 28, 1997. Similarly, because the protected activity which serves as a predicate for Count II occurred after May 2000, the statute of limitations for retaliation could not run from May of 2000. In determining when an adverse employment action occurred, the Court looks to the time when the discriminatory acts occurred—in this case, the alleged retaliation. *See Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980).[21] The statute of limitations started to run on May 18, 2001 and plaintiff's retaliation claim as to tenure by default is not untimely.

### 2. Exhaustion Of Administrative Remedies

■ Plaintiff's KHRC complaint of September 26, 2000 and plaintiff's EEOC complaint of February 6, 2001 did not mention the denial of tenure by default—either as the basis for a retaliation claim or as a substantive act of discrimination. Defendants therefore claim that they are entitled to summary judgment because plaintiff did not exhaust administrative

---

21. Defendants rely upon *Delaware State College* for the proposition that the statute of limitations starts to run on the date when tenure is denied, not the date of plaintiff's subsequent termination. *Id.* at 257–58, 101 S.Ct. 498. In that case, plaintiff complained of the denial of merit-based tenure, which lead to his termination. *Id.* at 257, 101 S.Ct. 498. The Supreme Court held that mere con-

tinuity of employment, after an employee has received notification of imminent termination, does not prolong the life of a cause of action for discrimination. *Id.* Plaintiff does not premise her claim on the denial of merit-based tenure in May 2000. Rather, she claims that the denial of tenure by default in May 2001 was retaliatory.

remedies on any claim that they retaliated by denying her request for tenure by default. Plaintiff contends that exhaustion was not required because the retaliation claim was reasonably related to the administrative charges, in that the KHRC and EEOC charges caused defendants to retaliate by denying her claim for tenure by default.

When adverse employment action is committed in retaliation for the filing of a charge of discrimination, plaintiff need not file an additional charge. *See Seymore v. Shawver & Sons, Inc.,* 111 F.3d 794, 799 (10th Cir.1997). Defendants cite *Dunegan v. City Of Council Grove, Kan.,* 77 F.Supp.2d 1192 (D.Kan.1999), to support their claim that charges of retaliation are not always reasonably related to other complaints in an EEOC charge. Indeed, that situation occurs when "a retaliatory act occurs prior to the filing of a charge and the employee fails to allege the retaliatory act or a retaliation claim in the subsequent charge." *Seymore,* 111 F.3d at 799.

Plaintiff alleges that defendants retaliated after she filed administrative charges, and her claims are not premised on retaliatory events that occurred before she filed her charges. Plaintiff's retaliation claim is reasonably related to her administrative charges, and defendants are not entitled to summary judgment on the theory that plaintiff failed to exhaust administrative remedies with respect to this retaliation claim.

### B. Plaintiff's Prima Facie Case

Retaliation claims utilize the *McDonnell Douglas* burden-shifting methodology. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Shinwari v. Raytheon Aircraft Co.,* 215 F.3d 1337, 2000 WL 731782, at *8 (10th Cir. June 8, 2000); *Smith v. Bd. Of Public Util.,* 38 F.Supp.2d 1272, 1285–1287 (D.Kan.1999); *Benhardt*

*v. Bd. Of County Comm'rs Of County Of Wyandotte,* 9 F.Supp.2d 1252, 1261–63 (D.Kan.1998). Under the burden-shifting analysis, plaintiff first bears the burden of establishing a prima facie case of discrimination. If she sets forth facts to establish a prima facie case, the burden shifts to defendants to rebut the presumption of discrimination by articulating a legitimate nondiscriminatory reason for the adverse employment decision. *See Texas Dep't. Of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *EEOC. v. Ackerman,* 956 F.2d 944, 947 (10th Cir.1992). "At the summary judgment stage, it then becomes the plaintiff's burden to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e. unworthy of belief." *Randle v. City Of Aurora,* 69 F.3d 441, 451 (10th Cir.1995). If plaintiff makes out a prima facie case of discrimination and creates an issue of fact whether defendants' reasons are pretextual, plaintiff's claim withstands summary judgment. *See id.*

To state a prima facie case of retaliation under Title VII, plaintiff must show that (1) she engaged in protected opposition to Title VII discrimination; (2) she suffered an adverse employment action contemporaneous with or subsequent to such opposition; and (3) a casual connection links the protected activity and the adverse employment action. *See Penry v. Fed. Home Loan Bank Of Topeka,* 155 F.3d 1257, 1263 (10th Cir.1998). Plaintiff can establish the causal connection by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Burrus v. United Tel. Of Kan., Inc.,* 683 F.2d 339, 343 (10th Cir.1982). Defendants concede that when plaintiff filed administrative complaints, she en-

gaged in protected opposition to a Title VII violation. The first element of plaintiff's prima facie case is not in dispute.

As to the second element, an adverse employment action is a tangible employment action that constitutes a significant change in employment status "such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Adverse employment actions are liberally defined, but the Court must analyze each alleged adverse action on a case-by-case basis after "examining the unique factors relevant to the situation at hand." *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir.1998).

Plaintiff alleges that because she filed administrative charges of discrimination, defendants removed her from the graduate faculty and denied her request for graduate faculty status for the 2000–2001 academic year (Count I), and denied her requests for tenure by default and terminated her relationship with the University (Count II). Defendants argue that as a matter of law, their actions (1) did not constitute adverse employment actions and (2) were not causally connected to her filing of administrative charges.

### 1. Adverse Employment Action

### a. Graduate Faculty Status

In assessing whether denial of graduate faculty status constitutes an adverse employment action, the Court is guided by the Tenth Circuit ruling in *Aquilino v. Univ. Of Kan.*, 268 F.3d 930 (10th Cir.2001). In *Aquilino*, plaintiff had been denied tenure and therefore had no right to be on a student dissertation committee or serve as a member of the graduate faculty. *Id.* at 934–35. Given her tenure situation, the Tenth Circuit found

as a matter of law that plaintiff's removal from the graduate faculty and student dissertation committee did not constitute adverse employment actions. *See id.* (citing *Sanchez*, 164 F.3d at 532) ("we will not consider a mere inconvenience or an alteration of job responsibilities to be an adverse employment action"). It noted that the University's actions had a de minimus effect on plaintiff's future employment opportunities, that they were normal incidents of the denial of tenure and that they merely altered her job responsibilities in the last months of her employment. *Id.*

Plaintiff attempts to distinguish her case from *Aquilino*, arguing that she does not claim harm to future employment opportunities, but loss of eligibility for faculty travel grants. Plaintiff cites no evidence that with graduate faculty status, she was eligible for, and would have received, a travel grant. Furthermore, on these facts, loss of an opportunity to apply for a faculty travel grant does not constitute an adverse employment action. Indeed, denial of graduate faculty status and any corresponding ineligibility for faculty travel grants must be construed as normal incidents of the denial of tenure. This case is virtually indistinguishable from *Aquilino*, and defendants are entitled to summary judgment on Count I. The Court finds that as a matter of law, removing plaintiff from the graduate faculty and denying her request for an extension of graduate faculty status are not adverse employment actions. Therefore it does not consider whether these actions are causally connected to protected activity by plaintiff.

### b. Denial Of Tenure By Default

Plaintiff argues that because she filed administrative charges of discrimination, defendants denied her tenure by default and terminated her employment with the

University.[22] Plaintiff contends that defendants' refusal to rescind her notice of non-reappointment and to grant tenure by default is a significant change in her employment status which constitutes adverse action. Defendants claim that the denial of tenure by default had no effect on plaintiff's employment because she was already a terminal contract employee.

Defendants cite *Aquilino* for the proposition that where merit-based tenure had been denied, denial of tenure by default is not a tangible employment action. In *Aquilino*, defendants had denied plaintiff merit-based tenure and later denied her requests for unpaid appointments as an ad hoc member of the graduate faculty and as an adjunct research associate with a university foundation. *See* 268 F.3d at 933. Plaintiff asserted that the later refusals constituted adverse employment actions since they harmed her future employment opportunities. *Id.* The Tenth Circuit disagreed, finding as a matter of law that they were normal incidents of the denial of tenure and, in the case of the ad hoc position, did not alter the terms and conditions of plaintiff's employment. Furthermore, plaintiff only relied on speculation and did not show that the denial of the research associate position, rather than the denial of tenure itself, harmed her future employment opportunities. *Id.* at 934–36.

▪ Although *Aquilino* is similar to the case at bar, the Court is not convinced that as a matter of law, the denial of tenure by default is qualitatively akin to the denial of an unpaid ad hoc graduate faculty position or an unpaid adjunct research associate position. In one sense, it is true that once the University denied

plaintiff's bid for merit-based tenure, the denial of tenure by default did not make her worse off—she remained on a terminal contract. Failure to rescind an earlier employment decision does not typically give rise to another discrimination claim. *See Haeberle v. Univ. Of Louisville,* No. 01–44, 2002 WL 768316, at *1 (W.D.Ky. Apr.29, 2002) (refusal to reconsider tenure decision did not give rise to another discrimination claim); *see also Nyhard v. U.A.W. Intern.,* 174 F.Supp.2d 1214, 1217 (D.Kan.2001). Therefore, if plaintiff were challenging defendants' refusal to reconsider the *merit*-based tenure decision, that refusal would be a normal incident of the previous denial of tenure, and not a separate adverse employment action. In this case, however, plaintiff asserts that she was entitled to *non*-merit-based tenure and that but for her protected activity, defendants would have disregarded the original tenure decision, rescinded her terminal contract, and granted her tenure by default. When the only acts of discrimination occur during the pendency of a tenure appeal and may have tainted the reconsideration process, plaintiff may have a separate claim based on the reconsideration of her denial of tenure appeal. *See Lim v. Trustees Of Ind. Univ.,* No. 99–0419, 2001 WL 1912634, at *27 (S.D.Ind. Dec.4, 2001).

In this case, plaintiff alleges that defendants retaliated on account of protected activity which occurred after defendants' decision on merit-based tenure. Furthermore, plaintiff seeks to vindicate a right to tenure which is not based on merit. Although defendants' denial of tenure by default left plaintiff in no worse position than she already was in—on terminal contract

---

**22.** The *Pretrial Order* (Doc. # 40) filed April 18, 2002, refers both to plaintiff's termination and the denial of tenure by default. In their motion for summary judgment, defendants also refer to both actions. In her response, however, plaintiff only discusses the denial of

tenure by default. Because termination of plaintiff's employment was part and parcel of the decision to deny her claim of tenure by default, the Court does not separately discuss that aspect of her retaliation claim.

with imminent termination—the denial of tenure by default is not a typical incident of the denial of merit-based tenure. On this record, the Court cannot find as a matter of law that defendants did not engage in adverse employment action when they denied plaintiff's request for tenure by default. A reasonable jury could find that irrespective of the merit of defendants' original tenure decision, the decision to deny tenure by default was akin to a termination of plaintiff's employment.

## 2. Causal Connection

The final element of plaintiff's prima facie case is a causal connection between her protected activity and defendants' adverse employment action. Defendants contend that plaintiff has not shown a causal connection between the denial of tenure by default on May 18, 2001 and plaintiff's filing of administrative charges on September 26, 2000 and February 6, 2001. Specifically, defendants contend that the time lapse between the filing of plaintiff's last administrative charge and the denial of tenure by default (three and one half months) is insufficient to support a causal connection—particularly because plaintiff initiated the inquiry and thus controlled the timing of the decision to deny her request for tenure by default.

In support of her causal connection theory, plaintiff cites three pieces of evidence: (1) the temporal proximity between her protected activities of September 26, 2000 and February 6, 2001, and the adverse employment action of May 18, 2001; (2) a pattern of retaliatory conduct after she filed her first administrative charge on September 26, 2000, consisting of Dr. Keel's refusal to endorse her request to extend her graduate faculty status on January 19, 2001 and defendants' denial of tenure by default on May 18, 2001; and (3) the fact that defendants violated unwritten policies or practices regarding tenure by default.

Plaintiff first relies on the temporal proximity between her KHRC and EEOC charges of September 26, 2000 and February 6, 2001, and the decision to deny her request for tenure by default on May 18, 2001. Unless the employer's adverse action "is very closely connected in time to the protected conduct, the plaintiff will need to rely on additional evidence beyond mere temporal proximity to establish causation." *Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir.1999) (citing *Conner v. Schnuck Markets, Inc.,* 121 F.3d 1390, 1395 (10th Cir.1997)). On one hand, the Tenth Circuit has held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation. *See id.* (citing *Ramirez v. Okla. Dep't Of Mental Health,* 41 F.3d 584, 596 (10th Cir.1994)). On the other hand, it has held that a three-month period, standing alone, is insufficient. *See id.* (citing *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir.1997)). In this case, plaintiff relies on an eight month period between her KHRC charge and defendants' decision to deny tenure by default and a three and one half month period between her EEOC charge and defendants' decision to deny tenure by default. Based on Tenth Circuit precedent, these time periods by themselves are too long to sufficiently make a prima facie showing of causation.

To establish a causal relationship between her protected activity and defendants' denial of tenure by default on May 18, 2001, plaintiff next relies on a "pattern" of retaliatory conduct which began soon after she filed her KHRC charge of discrimination on September 26, 2000. The so-called "pattern" consists of two incidents: the denial of graduate faculty status on January 19, 2001 and the denial of tenure by default on May 18, 2001. The denial of tenure by default cannot logically

be part of the pattern of retaliatory conduct which links plaintiff's protected activity to the denial of tenure by default. The Court therefore focuses on the University's decision to deny plaintiff graduate faculty status on January 19, 2001. Plaintiff can demonstrate a causal connection by demonstrating a pattern of retaliatory conduct that began soon after her protected activity and finally resulted in the denial of tenure by default. *See Palmer v. Leawood S. Country Club, Inc.,* No. 97–2515, 1998 WL 724050, at *6 (D.Kan. Sept.9, 1998) (citing *Marx v. Schnuck Mkts., Inc.,* 76 F.3d 324, 329 (10th Cir.1996)). The graduate faculty decision, however, occurred almost four months after plaintiff filed her KHRC claim. It did not occur soon after plaintiff's protected activity. Moreover, this isolated decision does not evidence a pattern of retaliatory conduct. For purposes of establishing causation, plaintiff has not demonstrated a genuine issue of material fact with regard to a pattern of retaliatory conduct.

■■■ Finally, plaintiff asserts that defendants violated unwritten policies or practices regarding tenure by default. Plaintiff refers solely to the fact that in 1973, the University granted tenure to 11 faculty members who had been hired under a five-year probationary period and did not receive timely notice of non-reappointment after the University switched to a seven-year probationary period. For obvious reasons, plaintiff is not similarly situated to any of these faculty members; the University did not lengthen the tenure track or otherwise change the tenure rules in any relevant respect during plaintiff's probationary period. Furthermore, the University's treatment of these 11 faculty members reveals no unwritten policy or practice on the relevant issue in this case: whether less than full time teaching for one semester should extend the probationary period for one academic year or merely for one semester. Plaintiff cannot seriously contend that the University has an unwritten policy or practice of granting tenure by default in all cases which involve disputed probationary periods. Furthermore, it is not evident that "administrative errors," rather than a change of policy, dictated the grant of tenure to the 11 faculty members in 1973. Most importantly, however, plaintiff has not explained how any violation of unwritten policy or practice reveals a causal relationship between her protected activity and defendants' denial of tenure by default on May 18, 2001. Such a violation may be relevant to show pretext, but it does not establish a genuine issue of material fact with regard to causation.

In summary, defendants are entitled to summary judgment because the record reveals no causal relationship between plaintiff's protected activity and defendants' denial of her request for tenure by default.

## C. Legitimate Nondiscriminatory Reason/Pretext

■■■ Even if plaintiff could establish a prima facie case, defendants are entitled to summary judgment because plaintiff has not offered sufficient evidence to establish that their proffered reason for denying her claim of tenure by default is pretextual.

■■■ Defendants assert that they denied tenure by default because under their interpretation of University policies, plaintiff had not earned it. Defendants emphasize that in 1994 and 1997, plaintiff knew that the University had extended her tenure clock, yet she did not dispute either extension until the University had decided to deny her tenure based on merit. Defendants need not prove that their nondiscriminatory reason is true or litigate the merits of their reason; they only need to provide a nondiscriminatory reason that is specific and clear. *See Palmer,* 1998 WL 724050, at *6 (citing *EEOC v. Flasher Co.,*

*Inc.,* 986 F.2d 1312, 1316 (10th Cir.1992)). Plaintiff concedes that if proven, defendants have a legitimate nondiscriminatory reason for their decision.

■ In order to defeat defendants' summary judgment motion, plaintiff must demonstrate a factual question whether defendants' articulated reasons are a pretext for discrimination. The relevant inquiry is not whether defendants' proffered reasons are correct, but whether defendants "honestly believed those reasons and acted in good faith upon those beliefs." *Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1318 (10th Cir.1999). When assessing a contention of pretext, the Court examines the facts as they appeared to the persons making the decision. *See Doebele v. Sprint Corp.,* 157 F.Supp.2d 1191, 1216 (D.Kan.2001) (citing *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1231 (10th Cir.2000) and *Shorter v. ICG Holdings, Inc.,* 188 F.3d 1204, 1209 (10th Cir.1999) (manager's perception of employee performance is relevant in determining pretext)). The Court may not second-guess the business judgment of the employer. *See Simms v. Okla. ex rel. Dept. of Mental Health & Substance Abuse Servs.,* 165 F.3d 1321, 1330 (10th Cir.1999). The relevant question is whether the reason articulated by the employer was the real reason for the challenged action. "While close temporal proximity between protected activity and an adverse employment action is a factor in determining pretext, that alone is not sufficient to raise a triable issue of fact." *Johnson v. Okla. ex rel. Univ. Of Okla. Bd. Of Regents,* 229 F.3d 1163, 2000 WL 1114194, at *1 (10th Cir. Aug.7, 2000); *see also Selenke v. Med. Imaging of Colo.,* 248 F.3d 1249, 1260 (10th Cir.2001).

■ A plaintiff typically makes a showing of pretext in one of three ways: (1) with evidence that defendant's stated reason for the adverse employment action was false; (2) with evidence that defendant acted contrary to a written company policy; or (3) with evidence that defendant acted contrary to an unwritten policy or contrary to company practice.[23] *See Kendrick,* 220 F.3d at 1230 (citations omitted).

Plaintiff's pretext argument relies upon the three pieces of evidence that she listed earlier, in conjunction with her prima facie case: (1) temporal proximity between her discrimination charges of September 26, 2000 and February 6, 2001 and the denial of tenure by default on May 18, 2001; (2) a pattern of retaliatory conduct; and (3) evidence that in denying her tenure by default, defendants violated unwritten policies or practices. Plaintiff also claims that the stated reason is false because she is entitled to tenure by default under University policy. The Court re-examines this evidence in light of defendants' proffered rationale for their actions.

Timing alone can provide sufficient support for plaintiff's prima facie case, but it is not alone sufficient to make a showing of pretext. *See Selenke,* 248 F.3d at 1260; *see also Powers v. Tweco Prods., Inc.,* 206 F.Supp.2d 1097, 1118 (D.Kan.2002). Plaintiff attempts to demonstrate pretext through proof of temporal proximity: a so-called pattern of discriminatory conduct that began soon after her protected activity and culminated in the denial of tenure by default. As noted above, plaintiff's only evidence of a "pattern" of retaliatory conduct is defendants' refusal to extend her graduate faculty status on January 19, 2001—which occurred almost four months after plaintiff filed her KHRC charges on

---

**23.** Direct evidence of pretext would obviously be sufficient, but plaintiff does not assert that she has such evidence.

September 26, 2000 and four or five months before defendants denied her request for tenure by default on May 18, 2001.[24]

In another tenure case, plaintiff made a successful showing of pretext based on a pattern of retaliatory conduct which included heightened scrutiny and criticism, divergence from internal procedures, disparate treatment, adverse evaluation, negative tenure recommendation, denial of tenure, unequal rate of pay and finally termination from employment. *See Lee v. N.M. State Univ. Bd. Of Regents*, 102 F.Supp.2d 1265, 1277–78 (D.N.M.2000); *see also O'Neal v. Ferguson Const. Co.*, 35 F.Supp.2d 832, 835 (D.N.M.1999) (pattern shown when defendant gradually started taking work away from plaintiff, asked plaintiff to wash vehicle in freezing weather and was hostile toward him); *Palmer*, 1998 WL 724050, at *6 (pattern shown where employer ignored plaintiff's work restrictions and ultimately terminated him); *Marten v. Yellow Freight Sys., Inc.*, 993 F.Supp. 822, 827 (D.Kan.1998) (pattern shown where defendants withdrew administrative assistance and support and began keeping personal file on plaintiff, demoted plaintiff, asked others for negative record on plaintiff, tried to intimidate plaintiff into dropping claim, issued corrective action notice and terminated plaintiff). In this case, as noted above, plaintiff has not demonstrated a genuine issue of material fact with regard to temporal proximity or a "pattern" of retaliatory conduct.[25] Two incidents, one of which includes the adverse action of which plaintiff complains, do not constitute a "pattern" of retaliatory conduct. *See Ortiz v. W. Res., Inc.*, No. 98–4093–DES, 2000 WL 1473142, at *9 (D.Kan. Sep.3, 2000) (denial of promotion coupled with termination insufficient to show pattern of retaliatory conduct).

Plaintiff next argues that defendants violated unwritten policies or practices by not granting her tenure by default when it was unclear whether her tenure clock had been properly set. In support of this argument, plaintiff claims that in 1973, the University granted tenure to 11 faculty members with disputed probationary periods. Plaintiff can show pretext through evidence that when making an adverse employment decision affecting her, defendants acted contrary to unwritten policy or contrary to University practice. *See EEOC v. Kan. City S. Ry. Co.*, No. 99–2512, 2000 WL 1784138, at *4 (D.Kan. Nov.30, 2000). The problem, however, is that plaintiff has not shown that the University or the Board of Regents had an unwritten policy or custom which they failed to follow in her case. Plaintiff cites one incident, nearly 30 years earlier, in

---

**24.** As previously noted, defendants' refusal to extend plaintiff's faculty status occurred before plaintiff filed her EEOC charge on February 6, 2001. To the extent that defendants' refusal to extend plaintiff's graduate faculty status suggests pretext with regard to tenure by default, it would only substantiate plaintiff's claim of retaliation with regard to the KHRC charge of September 26, 2000.

**25.** Plaintiff's termination cannot be part of a pattern of retaliatory conduct because defendants gave her a terminal contract in March 2000, before she filed her KHRC and EEOC charges. On this record, no reasonable jury would find that defendants' refusal to retain plaintiff on the graduate teaching faculty was retaliatory. The evidence is uncontroverted that faculty members with terminal contracts were not normally allowed to continue on the graduate teaching faculty. Defendants granted plaintiff an exception to this rule in the fall of 2000, so that she could work with a previously-enrolled graduate student, and refused to extend the exception through the spring of 2001. A temporary lapse in enforcing a requirement "does not taint the legitimacy of later enforcement and is at most a scintilla of evidence that does not create a genuine issue of material fact" whether defendants' reason for later enforcing the requirement is pretextual. *See Rekstad v. First Bank Sys., Inc.*, 30 Fed. Appx. 842, 847 (10th Cir.2002).

which the University granted tenure by default to 11 faculty members. The record contains no evidence that the University (or the faculty) regarded the events of 1973 to be precedent-setting or illustrative of established policy or practice. The record also contains no evidence that the University routinely granted tenure by default on account of administrative errors or disputes concerning the calculation of probationary periods for faculty. In fact, the record contains no evidence that the circumstances of either 1973 or 2001 involved administrative errors or miscalculations of probationary periods. Finally, plaintiff has not shown that she is entitled to the benefit of the policy or practice—even if it did exist and the record established the substance of the policy or practice.

Plaintiff's final argument is that defendants' rationale for denying tenure by default is false: that she had engaged in seven years of full time teaching service without timely notice of non-reappointment, and that defendants' claim to the contrary is without merit. As noted above, defendants extended plaintiff's tenure clock on two occasions, for one year each time, as a result of plaintiff's FMLA leave in the fall semesters of 1994 and 1997. On each occasion, defendants' informed plaintiff that her probationary period had been advanced by one year. Plaintiff made no contemporaneous objection to either extension. Defendants have cited evidence that they calculate full time service on an annual basis. Although plaintiff cites evidence that other parties calculate full time service on a semester-by-semester basis, she has cited no evidence that defendants calculate full time service on other than an annual basis, or that they have an unwritten custom or

policy of using the semester method. Plaintiff does not claim that by calculating full time service on an annual basis, defendants have breached any formal or written policy, any contract of employment, any policy or regulation of the Kansas Board of Regents, or any Kansas state law. In other words, plaintiff has cited no evidence that defendants' stated reason for denying her tenure by default—that the University calculates tenure on an annual basis and that by its calculations, plaintiff was not entitled to tenure—was pretextual. When assessing a claim of pretext the Court examines the facts as they appeared to the Chancellor and the Provost. Nothing in this record would cause a jury to discredit their understanding that the University calculates full time teaching on an annual basis. Even if their understanding were later determined to be incorrect, through litigation of this case, the record evidence would not support a finding of pretext in this case.[26] Defendants are therefore entitled to summary judgment on Count II.

## II. Section 1983 Due Process Claim

Count III charges that in their official capacities, the Chancellor and Provost violated the Fourteenth Amendment and Section 1983 by depriving plaintiff of employment without due process. Plaintiff seeks injunctive relief and a declaration that defendants have denied her constitutional rights and that she is entitled to reinstatement as a tenured faculty member. She also seeks back pay, economic damages and attorney's fees and costs. Defendants argue that they are immune from suit because the Eleventh Amendment bars plaintiff's request for relief in the form of back pay, economic damages and attorney's fees and costs.[27]

---

26. In any event, any rational jury would find that defendants' actions did not violate University policy for reasons stated below.

27. Defendants also assert that the Chancellor and Provost are entitled to qualified immunity on plaintiff's claim for prospective injunctive relief. As plaintiff makes clear in her response to defendants' summary judgment mo-

## A. Eleventh Amendment Immunity As To Back Pay, Economic Damages and Declaratory Relief

■ Defendants first argue that the Eleventh Amendment bars plaintiff's claims for back pay, economic damages and declaratory relief. Generally speaking, defendants are correct. Defendants are absolutely immune from damages for actions taken in their official capacities. *See Gillette v. New Mexico Parole Bd.,* 42 Fed.Appx. 210, 2002 WL 1360384, at *1 (10th Cir. June 24, 2002). Furthermore, although the Eleventh Amendment does not prohibit a suit brought in federal court to prospectively enjoin a state official from violating federal law, *see Ex parte Young,* 209 U.S. 123, 159–60, 28 S.Ct. 441, 52 L.Ed. 714 (1908), declaratory relief is not the type of remedy designed to prevent ongoing violations of federal law, and the Eleventh Amendment "does not permit judgments against state officers declaring that they violated federal law in the past." *See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 146, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993).

State officials such as the Chancellor and Provost may not be protected by Eleventh Amendment immunity on plaintiff's claim for prospective injunctive relief. *See Seminole Tribe v. Florida,* 517 U.S. 44, 73, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), *Ex parte Young,* 209 U.S. at 159–60, 28 S.Ct. 441. Therefore, unless plaintiff's claim for injunctive relief has merit and declaratory relief is ancillary to it, defendants are entitled to immunity from suit on plaintiff's Section 1983 claim for declaratory relief. Given the Court's ruling on the merits of the case, issues of Eleventh Amendment immunity need not be further addressed.

## B. Validity Of Procedural Due Process Claim

■ Defendants concede that the Eleventh Amendment does not bar plaintiff's claim for reinstatement, but they argue that plaintiff has not shown that they violated her right to procedural due process. The Court therefore considers whether plaintiff has stated a claim for violation of her constitutional right to procedural process. In order to prove a violation of procedural due process, plaintiff must show that (1) she possessed a protected property interest in continued employment such that due process protections were necessary, and (2) defendants deprived her of the appropriate level of due process. *See Hatfield v. Bd. Of County Comm'rs,* 52 F.3d 858, 862 (10th Cir.1995). In light of this framework, the Court turns to the threshold issue whether plaintiff possessed a protected property interest.

■ Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Farthing v. City Of Shawnee, Kan.,* 39 F.3d 1131, 1135 (10th Cir.1994) (quoting *Bd. Of Regents Of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). Historically, Kansas has followed the common law doctrine of employment-at-will. *Anglemyer v. Hamilton County Hosp.,* 58 F.3d 533, 537 (10th Cir.1995) (citations omitted). Under Kansas law, a public employee who is terminable at will does not possess a protected property interest. *See Farthing,* 39 F.3d at 1136 (citing *Stoldt v. City Of Toronto,* 234 Kan. 957, 964–65, 678 P.2d 153, 160 (1984)). Tenured professors, on the other hand, have a property interest in continued employment. *See Tonkovich v. Kan. Bd. Of*

tion, however, she only brings suit against Hemenway and Shulenberger in their official capacities. Qualified immunity only applies to suits against state officials in their individual capacities. *See Keeling v. Schaefer,* 181 F.Supp.2d 1206, 1217 (D.Kan.2001).

*Regents*, 159 F.3d 504, 517 (10th Cir.1998). The question is whether plaintiff earned tenure at the University.

 Plaintiff argues that she had a legitimate expectation of continued employment as a tenured faculty member based on an implied-in-fact contract of employment. In 1992, plaintiff signed a written notice of appointment which stated that her term of employment was "for the academic year (nine months)," that her appointment was subject to annual renewal, and that tenure would accrue "after 7 years of full-time teaching" absent timely notice to the contrary under University and Board of Regents regulations. *Appointment Letter* (Exhibit 1) in *Defendants' Exhibits* (Doc. # 43). Plaintiff argues that she completed her seventh year of full time teaching in May of 2000 and, because she did not receive timely notice of non-reappointment in May of 1999, she became a tenured professor effective May of 2000.

Defendants argue that plaintiff had not earned tenure under the contract and that she therefore possessed no property interest in her job. They agree that tenure would have accrued after seven years of full time teaching without timely notice of non-reappointment, but they assert that plaintiff's seventh year of full time teaching ended in May of 2001 and that they gave proper notice of non-reappointment in March of 2000.

The crux of the disagreement is what constitutes seven years of full time teaching under plaintiff's appointment contract. Defendants assert that in accordance with University policy, only a complete academic year of full time teaching counts toward the seven year threshold. The University has an annual schedule for tenure review and promotion decisions and, if a faculty member teaches only one full time semester in an academic year, he or she has only taught part time during that

year. To prevail, plaintiff must assert that a year of full time teaching means any two academic semesters, and indeed she argues that tenure accrues after any 14 semesters, the equivalent of seven years of full time teaching. The Court must examine plaintiff's contract to determine the meaning of a "year" of full time teaching.

 "In construing a contract, the intent of the parties is the primary question; meaning should be ascertained by examining the documents from all corners and by considering all of the pertinent provisions, rather than by critical analysis of a single or isolated provision; and reasonable rather than unreasonable interpretations are favored." *Akandas, Inc. v. Klippel*, 250 Kan. 458, 827 P.2d 37 (1992). When a contract is not ambiguous, the Court may not make another contract for the parties. Its function is to enforce the contract as made. *See Patrons Mut. Ins. Ass'n v. Harmon*, 240 Kan. 707, 713, 732 P.2d 741 (1987). "A contract is ambiguous if it contains 'provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language.'" *Am. Maplan Corp. v. Heilmayr*, 165 F.Supp.2d 1247, 1251–52 (D.Kan.2001) (quoting *Simon v. Nat'l Farmers Org., Inc.*, 250 Kan. 676, 679–80, 829 P.2d 884 (Kan.1992)). Whether a contract's terms are ambiguous is a question of law decided by the Court. *See United States v. Mintz*, 935 F.Supp. 1178, 1179 (D.Kan.1996). "Prior to a resort to extrinsic evidence, the instrument is to be interpreted from its four corners. That is to say, all the language used anywhere in the instrument should be taken into consideration." *First Nat'l Bank Of Olathe v. Clark*, 226 Kan. 619, 602 P.2d 1299, 1303 (Kan.1979) (citations omitted).

The 1992 appointment contract specified that the offered appointment was "for the academic year (nine months)," and that it was subject to annual review. *Appoint-*

*ment Letter* (Exhibit 1) in *Defendants' Exhibits* (Doc. # 43). The contract stipulates that "final tenure review ... will occur no later than the 6th year of full-time teaching .... Tenure will accrue after 7 years of full-time teaching ..." *Id.* The contract also stated that the appointment and annual review were subject to regulations of the University and the Board of Regents. *Id.* The 1990 version of the *Handbook,* which was in effect when plaintiff received her initial appointment, outlined the requirements for promotion and tenure. It stated that "[p]art-time service to the University in teaching, research, and administration does not count toward tenure." Exhibit 4 in *Defendants' Exhibits* (Doc. # 43) at 42. The *Handbook,* revised in 1997, again stated that "[p]art-time service to the University ... does not count toward tenure." Exhibit 30 in *Defendants' Exhibits* (Doc. # 43) at 61.

"Contracts are to receive a reasonable construction to determine the intent of the parties at the time the contract was executed.... Construction of the contract is one that makes the contract fair, customary and such as prudent persons would intend." *Weber v. Tillman,* 259 Kan. 457, 913 P.2d 84, 96–97 (Kan.1996). Arguably, a "year" of full time teaching could be an academic year (a nine-month period consisting of the fall semester of one year and the consecutive spring semester of the following year) or a calendar year.

Plaintiff's contract, however, is for an academic year; by its express terms, a year of full time teaching therefore means an academic year. The contract is not ambiguous in this regard. Regardless whether the contract meant an academic year or a calendar year of full time teaching, however, plaintiff did not have seven years of full time teaching.[28] When there is no ambiguity, there is no need for either judicial interpretation or application of liberal rules of construction. *B&K Mech., Inc. v. Fed. Ins. Co.,* 33 F.Supp.2d 941, 944 (D.Kan.1998) (citations omitted). Later disagreement by the parties to a contract regarding its meaning does not necessarily mean the contract is unclear. *Amoco Prod. Co. v. Kan. Power & Light Co.,* 505 F.Supp. 628, 635 (D.Kan. 1980) (citations omitted). Consequently, the Court finds as a matter of law that the contract is not ambiguous; it expressly stipulates that a "year" of full time teach-

---

**28.** Plaintiff could only prevail under one of two scenarios: First, plaintiff could recover if the contract contemplates seven academic years of full time teaching and allows her to add together the spring semesters of 1995 and 1998 to satisfy that requirement. Plaintiff taught full time in six academic years (1992–1993, 1993–1994, 1995–1996, 1996–1997, 1998–1999 and 1999–2000) and two academic semesters (the spring of 1995 and the spring of 1998), and would have seven years of full time teaching if the latter two semesters were added together. Second, plaintiff could recover if the contract contemplates seven calendar years of full time teaching and allows her to meet the calendar year requirement by adding together the fall semester of 1992 and the spring semester of 1994, along with the spring semester of 1997 and the spring semester of 2000. Plaintiff taught full time in only five calendar years (1993, 1995, 1996, 1998 and 1999) and four additional semesters (the fall of 1992 and the spring semesters of 1994, 1997 and 2000). If the four non-consecutive semesters were counted as two calendar years, plaintiff would have seven calendar years of full time teaching. This definition is problematic because it ignores summer school, which would necessarily seem to be included in a calendar year of full time teaching. It also ignores the contract language that plaintiff's appointment is for an "academic year (nine months)." In any case, any ambiguity would involve the limited issue whether a "year" of full time teaching means an academic year (as defined above) or a calendar year. Plaintiff's claim that under the contract, a "year" can also mean any two random non-consecutive semesters finds no merit in the contract language or the case law.

ing is full time teaching for a full nine-month academic year, as defined above.

██ Even if the Court were to find that the contract is ambiguous and look to extrinsic evidence, its ruling would not change. "In construing an ambiguous ... contract, the court may take into consideration the interpretation placed upon the contract by the parties themselves. If the parties have by their conduct placed an interpretation on an ambiguous contract, it will be followed by the court." *First Nat'l Bank Of Olathe v. Clark*, 226 Kan. 619, 602 P.2d 1299, 1303 (1979) (citation omitted). Accordingly, the court looks to the subsequent conduct of the parties—their practical construction of terms of the contract. *See City Of Wichita, Kan v. Southwestern Bell Tel. Co.*, 24 F.3d 1282, 1287 (10th Cir. 1994). "If parties to a contract, subsequent to its execution, have shown by their conduct that they have placed a common interpretation on the contract, this interpretation will be given great weight." *Id.* (citing *Heyen v. Hartnett*, 235 Kan. 117, 679 P.2d 1152, 1157 (1984); *First Nat'l Bank Of Olathe*, 602 P.2d at 1304; *Reese Exploration, Inc v. Williams Natural Gas Co.*, 983 F.2d 1514, 1519 (10th Cir. 1993)).

Here, defendants informed plaintiff on two occasions that they were extending her tenure clock for one year because she held part time status during those years. Plaintiff made no contemporaneous objection on either occasion. Plaintiff understood that teaching one full time semester in an academic year did not constitute half a year of full time teaching for purposes of tenure. In their letter dated March 15, 1995, defendants stated that "[u]nder our tenure regulations, part-time service does not count toward the probationary period. Therefore, the date of your mandatory re-

view for tenure has been adjusted to reflect this change in status. The review must occur no later than 1998–99 academic year." Exhibit 3 in *Defendants' Exhibit* (Doc. #43). In March of 1997, plaintiff confirmed to Dr. Keel her understanding that "taking this reduction [part-time FMLA leave] will automatically postpone the mandatory tenure review by one year." Exhibit 6 in *Defendants' Exhibit* (Doc. #43). Defendants' response in March of 1997, stated that "[u]nder our tenure regulations, part-time service does not count toward the probationary period. Therefore, we have adjusted the date of your mandatory review for tenure to reflect this change in status. The review must occur no later than the 1999–2000 academic year." Exhibit 7 in *Defendants' Exhibits* (Doc. # 43). Furthermore, plaintiff did not request tenure by default in May of 2000, when she was allegedly entitled to it, but waited until May of 2001, when her termination was imminent. At that time she again acknowledged the following facts:

> I have been an assistant professor ... since the Fall Semester of 1992. In my third year (1994–1995), I was granted a reduced appointment (60%) ... for the Fall Semester under the ... Family and Medical Leave Act. This reduced appointment stopped the tenure clock for one year and postponed my third-year review to the Spring Semester 1996.... In the spring Semester of 1997 ... I requested a year's leave. Only the Fall Semester 1997 was granted .... This stopped the tenure clock for another year and moved the tenure review to the Fall Semester 1999.

Exhibit 21 in *Defendant's Exhibits.*[29] For these reasons, the Court finds as a matter

---

**29.** In her letter plaintiff admits that her reduced appointment in 1995 stopped her tenure clock for one year. She asserts, however, that the 1997 extension was an administrative

error. Plaintiff does not explain why the analysis should be different on the second reduction. Further, this assertion is contrary to plaintiff's contemporaneous acknowledg-

of law that the parties interpreted a "year" of full time teaching to mean a nine-month academic year of full time teaching.

Based upon the evidence, the Court determines as a matter of law that the parties intended for tenure to be calculated on an annual basis and not, as plaintiff claims, on a semester-by-semester basis. Therefore plaintiff did not earn tenure by default in May of 2000 and she did not have a property interest in continued employment. As a result, defendants did not violate her rights to procedural due process under Section 1983 and the Fourteenth Amendment. Defendants are entitled to summary judgment on this claim.

**IT IS THEREFORE ORDERED** that defendants' *Motion For Summary Judgment Against Plaintiff Pagel Meiners* (Doc. # 41) filed May 6, 2002 be and hereby is **SUSTAINED**.

**IT IS FURTHER ORDERED** that *Plaintiff's Motion For Leave To File A Supplemental Memorandum In Opposition To Defendant's [sic] Motion For Summary Judgment* (Doc. # 50) filed July 19, 2002 be and hereby is **SUSTAINED**.

ment in 1997 that a reduced appointment would automatically postpone her tenure clock by one year—with tenure review to occur no later than the 1999–2000 academic year.